#### IN THE UNITED STATES DISTRICT COURT
#### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| | : | |
| v. | : | **NO. 21-238** |
| | : | |
| **ASA JACKSON** | : | |

## MEMORANDUM

**KEARNEY, J.**                                                                                           **March 22, 2022**

Our grand jury charged Asa Jackson with being a felon in possession of a firearm following a May 10, 2020 physical encounter with Theresa Coleman at a corner bodega followed minutes later with an encounter with her sister Naeema Peterson at her home and at the corner bodega. These encounters caused Ms. Peterson to call the police describing a man with a gun outside the store. Mr. Jackson now moves to suppress the sisters' separate identifications of him at trial as tainted from suggestive police procedures after the officers arrested Mr. Jackson, found a gun on the street near him, and placed him in the police car before the sisters walked down the street and faced police questions. We held two oral arguments and convened an evidentiary hearing so we could hear from the sisters as to their ability to identify Mr. Jackson. We evaluated the credibility of their testimony. Each sister had an independent, definite understanding of Mr. Jackson's identity before the police questions. We have no basis to find the officers' reference to a man wearing a red-and-black shirt and showing a firearm as unnecessarily suggestive. Even if we could find officers' unnecessarily suggestive conduct, the witnesses' identifications are reliable based on their earlier face-to-face encounters with Mr. Jackson. The officers' conduct did not override the sisters' independent knowledge of Mr. Jackson's identity.

I. **Adduced facts from testimony and body camera footage.**[1]

Theresa Coleman moved in with her sister Naeema Peterson and Ms. Peterson's three children in February 2020 near the Kensington section of Philadelphia. Ms. Coleman knew her sister's neighborhood.

Ms. Coleman, while pregnant, left her sister's home on a sunny May 10, 2020 day to walk to the corner bodega down a long block on their street. She heard a man from behind her yell, "Yo, shorty in the in the gray sweatpants!" She did not turn to see who yelled. She ignored the man's call. She entered the bodega. She heard the doorbell chime behind her and assumed the man who had yelled also entered the bodega. The man approached Ms. Coleman, said, "Bitch, that's what you get," and smashed a half-dozen frozen eggs into her face. Ms. Coleman and the man then "tussled" in the store.

Ms. Coleman observed the man, who did not wear a mask only two months into the COVID-19 pandemic, at a very close distance during this encounter. She recognized him because she had previously seen him speak to Ms. Peterson as he unsuccessfully courted Ms. Peterson. Ms. Coleman did not know the man or his name. Ms. Coleman noted he appeared to be high on drugs. She also noted he wore a red-and-black shirt.

The man left the store, yelling he would go get someone or something and return. Ms. Coleman immediately called Ms. Peterson from the bodega and told her, "That boy who is always trying to talk to you just hit me in the face with eggs." Ms. Peterson opened the front door of her home to walk to the bodega to help her sister. When Ms. Peterson opened the door, she saw a man standing on her steps holding a gun. She recognized the man from previous interactions in the neighborhood. She had given the man a number to contact her and had seen him a "handful" of times in person, having brief conversations as he tried to court her. Ms. Peterson knew the man as "Asic" and thought he visited a relative in the neighborhood from time to time. She knew him as

2

quiet and soft-spoken. But on May 10, 2020, he appeared belligerent, reeked of liquor, and yelled about how someone owed him money. The man pointed a gray gun at Ms. Peterson. Ms. Peterson left her home and walked quickly to the bodega to escape the man.

Ms. Peterson entered the bodega. She saw Ms. Coleman with egg yolk on her face. The man from her door soon arrived at the bodega; the store owner closed and locked the door to bar the man's entry. Each sister observed the man waving his gun outside the store and banging on the door using his gun. The man demanded they let him enter or he would shoot up the bodega. This encounter occurred a few minutes after the man and Ms. Peterson interacted at her home and about five to ten minutes after the man hit Ms. Coleman with eggs. Ms. Peterson called 9-1-1. She reported the actions of the man and described him, saying he wore a red-and-black shirt. The store owner also called 9-1-1.

The man soon left the bodega. Ms. Coleman and Ms. Peterson took a few moments to compose themselves and left the bodega to return home. On their way, they came upon police activity on a corner. They saw the man who threatened them; he was sitting in the back of a police car. They also saw several people standing on the corner near the police car. These people told Ms. Coleman and Ms. Peterson to tell the police nothing as they approached the corner.

Philadelphia Police Officer Baldt and a police sergeant questioned Ms. Coleman and Ms. Peterson as they passed the police car and the people on the street. The sisters first denied calling the police mindful of the people standing on the corner who told them to stay quiet. Officer Baldt asked, "Is that your brother?" Ms. Coleman responded, "Who?" Officer Baldt said, "The gentleman we have in the car." The sergeant said at the same time, "The guy with the red-and-black jacket on." The sisters did not directly answer the question mindful of the words from the people standing on the corner, but Ms. Coleman told the officers a man had attacked her. She also

said she did not know whether he possessed a gun. Officer Baldt asked Ms. Coleman what the attacker wore. Ms. Coleman responded, "red and black." Officer Baldt asked, "Like a checkered shirt?" Ms. Coleman answered, "Yeah." Officer Baldt said, "OK. That's the guy we got." Officer Baldt held a gun he had recovered while he questioned the women.

Ms. Coleman and Ms. Peterson both testified during our evidentiary hearing. They both identified Mr. Jackson as the man in the red-and-black shirt who assaulted and threatened them on May 10, 2020. They both swore they had "no doubt" Mr. Jackson assaulted and threatened them.

## II.   Analysis

Mr. Jackson moves to suppress Ms. Coleman and Ms. Peterson from identifying him during his trial. He argues Ms. Coleman and Ms. Peterson witnessing Mr. Jackson in the police car, Officer Baldt telling the women Mr. Jackson wore a red-and-black shirt, and Officer Baldt holding a gun while he questioned the women unconstitutionally taint their in-court identifications of Mr. Jackson. The United States responds the police employed no unnecessarily suggestive procedures, and even if they did, Ms. Coleman and Ms. Peterson's identifications are sufficiently reliable.

The Fifth Amendment prohibits the admission of eyewitness identifications which are "so unfairly prejudicial to the defendant that admitting the evidence would violate the defendant's due process rights."[2] "[T]he admission of identification evidence offends due process only if the evidence meets two criteria."[3] "First, the evidence must be 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'"[4] "Second, if the evidence is impermissibly suggestive, it must also be unreliable."[5]

Mr. Jackson shows neither element. The identification procedure bore minimal suggestiveness because the police possessed good reasons to conduct the identification as they did. But even assuming the police used a suggestive procedure, Ms. Coleman and Ms. Peterson's identifications are reliable.

4

### A. The police used a minimally suggestive identification procedure.

We first must consider whether suggestiveness taints Ms. Coleman's and Ms. Peterson's in-court identifications of Mr. Jackson. We must evaluate two factors: "(a) the suggestiveness of the identification, and (b) whether there was 'some good reason for the failure to resort to less suggestive procedures.'"[6] Unnecessarily suggestive identifications often include "show-up[s],"[7] "defined as a one-on-one confrontation where the witness views only the suspect."[8] Show-ups are necessary, however, "when there is an 'imperative' need for an immediate identification."[9] We may excuse a show-up's suggestiveness for good reasons, including if "the identification is conducted proximate to the time and scene of a crime and would enable police to quickly release the suspect if he were not identified as the perpetrator."[10]

The police used a minimally suggestive identification procedure. A "show-up" identification technically occurred because Ms. Coleman and Ms. Peterson saw Mr. Jackson alone in the back of the police cruiser without other suspects present. But the police did not instigate this confrontation. Ms. Coleman and Ms. Peterson were simply returning home from the bodega when they came upon Mr. Jackson in the car. Officer Baldt then asked the witnesses only basic questions about what happened before the women identified Mr. Jackson as the man who had threatened them. Ms. Coleman and Ms. Peterson's interactions with the police occurred shortly after the bodega incident and on the same block as the bodega. The police possessed good reasons to ask Ms. Coleman and Ms. Peterson basic details about the incident: The questioning occurred "proximate to the time and scene of a crime," "enable[d] police to quickly release the suspect if he were not identified as the perpetrator," and "help[ed] the police conduct a standard identification procedure in a way that swiftly minimized detaining the wrong suspects, thereby diminishing a safety threat to the officers and the community."[11] The police conduct is not unnecessarily suggestive.

5

### B. The sisters' identifications are reliable.

Even if slight suggestiveness affected the identifications, the identifications do not violate Mr. Jackson's due process rights because Ms. Coleman and Ms. Peterson's identifications are reliable. The second element of our inquiry recognizes "reliability of the identification can mitigate the risk of misidentification; nullifying the need for suppression."[12] A "sufficiently reliable" identification, in other words, can "override any suggestiveness of the show-up procedure."[13] We should consider the "totality of the circumstances" to determine reliability.[14] This includes five factors: "(1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness['s] degree of attention; (3) the accuracy of the witness['s] prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and confrontation."[15]

Both Ms. Coleman and Ms. Peterson's identifications satisfy these factors, which overrides any suggestiveness of the identification procedure. On the first factor, Ms. Coleman possessed a clear opportunity to view Mr. Jackson when he smashed eggs in her face and they tussled. Ms. Peterson also possessed extensive time to view Mr. Jackson when he appeared at her front door and held a gun in her face. Both women had a second, extended chance to see Mr. Jackson when he returned to the bodega, banged on the door, waved his gun in the air, and threatened to shoot up the bodega. Regarding the second factor, Ms. Coleman paid eagle-eyed attention to Mr. Jackson while she fought with him. Likewise, Ms. Peterson exhibited laser focus on Mr. Jackson when he pointed a gun in her face while her children sat feet away inside her home. And both women tracked him as he threatened to shoot up the bodega. Third, Ms. Peterson provided an accurate description of Mr. Jackson when she called the police, including the red-and-black shirt he wore.[16] Fourth, Ms. Coleman and Ms. Peterson displayed certainty when they spoke with Officer Baldt.[17] Fifth, Ms. Coleman and Ms. Peterson identified Mr. Jackson very shortly after the bodega

6

incident—indeed, neither woman made it home from the bodega before they identified Mr. Jackson.

We readily recognize the problems inherent in eyewitness testimony.[18] But this case does not implicate those problems to a constitutional degree. Our Court of Appeals instructs "'potential unreliability' alone is not enough to compel exclusion of an identification because . . . 'other safeguards'" minimize due process concerns.[19] Those safeguards—"cross-examination, the right to effective assistance of counsel, eyewitness-specific jury instructions, the beyond a reasonable doubt standard, and the state and federal rules of evidence"—all exist here.[20] Exclusion is unwarranted.

## III.  Conclusion

A man charged with being a felon in possession of a firearm seeks to exclude in-court identifications by two eyewitnesses. We conducted a hearing to assess the eyewitnesses' credibility. We find the eyewitnesses' identifications are reliable. We deny the man's motion to suppress the in-court identifications.[21]

---

[1] *See* ECF Doc. No. 36-2 (noting thumb drive of body camera footage submitted to court).

[2] *United States v. Hall*, --- F.4th ---, No. 20-2268, 2022 WL 762163, at *5 (3d Cir. Mar. 14, 2022).

[3] *Id.*

[4] *Id.* (emphasis removed) (quoting *Neil v. Biggers*, 409 U.S. 188, 196–97 (1972)).

[5] *Id.* (citing *Biggers*, 409 U.S. at 198–200).

[6] *United States v. Scott*, 420 F. Supp. 3d 295, 318 (E.D. Pa. 2019) (quoting *United States v. Stevens*, 935 F.2d 1380, 1389 (3d Cir. 1991)), *aff'd*, 816 F. App'x 732 (3d Cir. 2020).

[7] *United States v. Brownlee*, 454 F.3d 131, 138 (3d Cir. 2006) ("[A] show-up procedure is inherently suggestive because, by its very nature, it suggests that the police think they have caught the perpetrator of the crime.").

[8] 23 C.J.S. Criminal Procedure and Rights of Accused § 1090.

---

[9] *United States v. Shavers*, 693 F.3d 363, 382 (3d Cir. 2012) (quoting *Stovall v. Denno*, 388 U.S. 293, 302 (1967)), *cert. granted, judgment vacated on other grounds*, 570 U.S. 913 (2013).

[10] *Scott*, 420 F. Supp. 3d at 319.

[11] *Id.*

[12] *Id.* at 318.

[13] *Id.* at 319.

[14] *Brownlee*, 454 F.3d at 139.

[15] *Id.* (citing *Neil v. Biggers*, 409 U.S. 188, 199 (1972)).

[16] This factor is indeterminate as to Ms. Coleman, who made no previous identification of Mr. Jackson before speaking to the police.

[17] The video footage shows the women appearing uncertain about what Mr. Jackson did when they first spoke to Officer Baldt. We assume this is because of Mr. Jackson's apparent confederates being within earshot of the women when they spoke to the police. Indeed, Ms. Coleman and one confederate angrily yelled at each other at one point. Officer Baldt then moved the women out of the confederates' earshot. At that point, the women confidently spoke about what Mr. Jackson did.

[18] *See, e.g.*, *Bey v. Superintendent Greene SCI*, 856 F.3d 230, 240 (3d Cir. 2017) ("The scientific community has understood for decades that eyewitness identifications that are certain and confident are not necessarily accurate.").

[19] *Shavers*, 693 F.3d at 384 (quoting *Perry v. New Hampshire*, 132 S. Ct. 716, 728 (2013)).

[20] *Id.*

[21] We issued an Order denying the Defendant's Motion to suppress one day after our evidentiary hearing and a few days before trial. ECF Doc. No. 78. We held issuing this Memorandum until after the parties closed their cases before the jury to avoid inadvertent disclosure of underlying facts to the jury.